UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SANFORD DVORIN, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:12-CV-3728-G |
| CHESAPEAKE EXPLORATION, LLC, | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is the plaintiffs' motion for class certification (docket entry

37).  For the reasons stated below, the motion is denied.

### I. BACKGROUND

#### A. Factual Background

This suit concerns royalty payments under oil and gas leases.  The plaintiffs,

Sanford Dvorin and Melissa Thornton, are citizens and residents of Texas.

Complaint ¶¶ 2-3, 7 (docket entry 1).  The defendants, Chesapeake Exploration, LLC

and Chesapeake Operating, Inc. ("Chesapeake" or the "defendants"), are both

incorporated and located in Oklahoma.  *Id.* ¶¶ 4-5.  The plaintiffs own royalty

leasehold interests with Chesapeake through assigned interests from PFM, LLC, the

company that initially negotiated the leases with the plaintiffs.  *Id.* ¶¶ 10-11.

Chesapeake began production through these leases in 2008.  *Id.* ¶ 11.

Chesapeake has signed leases with thousands of other landowners throughout

North Texas.  *See* Appendix in Support of Defendants' Response and Objection to

Motion for Class Certification ("Chesapeake Appendix") at App 9-10 (docket entry

39).  After examining many of these leases through discovery, the plaintiffs have

identified three groups of leases that contain similar language in their royalty

provisions concerning post-production costs.  *See* Appendix in Support of Motion for

Class Certification ("Plaintiffs' Appendix") at App 6 (docket entry 37-1).  The

plaintiffs label these Groups A, B, and C.  Motion for Class Certification at 3 (docket

entry 37).  The royalty provisions of the leases in Group A contain the following

language:

> Lessee shall pay to Lessor the following royalties, which
> shall be free of all costs of any kind, including, but not
> limited to, costs of gathering, production, transportation,
> treating, compression, dehydration, processing, marketing,
> trucking or other expense, directly or indirectly incurred by
> Lessee, whether as a direct charge or reduced price or
> otherwise.  In this regard, Lessee agrees to bear one
> hundred percent (100%) of all costs and expenses incurred
> in rendering hydrocarbons produced on or from the lease
> premises marketable and delivering the same into the
> purchaser's pipeline for immediate transportation to an
> end user or storage facility.

Plaintiffs' Appendix at App 19 ¶ 4.  There are 44 leases within Group A.  Motion for

Class Certification at 3.

The Group B leases, which include the plaintiffs' leases, contain a provision

that states:

> Lessee shall pay to Lessor all royalties, free of all costs of
> any kind, including, but not limited to, costs of gathering,
> production, transportation, treating, compression,
> dehydration, separating, processing, marketing, trucking or
> other pre and post production expense, directly or
> indirectly incurred by Lessee, whether as a direct charge or
> a reduced price or otherwise (such prohibited costs are
> herein referred to as "PP Costs").  In this regard, Lessee
> agrees to bear one hundred percent (100%) of all costs and
> expenses incurred in rendering the oil, gas, hydrocarbon
> and non-hydrocarbon substances produced from the leased
> premises or lands pooled therewith marketable and
> delivering the same into the purchaser's pipeline for
> immediate transportation to an end user or storage facility.

Plaintiffs' Appendix at App 46 ¶ 19.  Group B consists of seven leases.  Motion for

Class Certification at 4.

Lastly, the Group C leases state:

> Lessee shall pay to Lessor the following royalties, which
> shall, except for Lessor's share of production severance
> taxes, be free of all costs of any kind, including but not
> limited to, costs of gathering, production, transportation,
> treating, compression, dehydration, processing, marketing,
> trucking or other expense, directly or indirectly incurred by
> Lessee, whether as a direct charge or reduced price or
> otherwise.  In this regard, Lessee agrees to bear one
> hundred percent (100%) of all costs and expenses incurred
> in rendering oil or gas produced on or from the leased

premises marketable and delivering same into the
purchaser's or transporter's trucks or pipeline.

Plaintiffs' Appendix at App 56 ¶ 5; Motion for Class Certification at 4-5.  Group C is

comprised of nineteen leases.  Motion for Class Certification at 4.

On August 1, 2011,[*] Chesapeake sent a letter to some North Texas

leaseholders, including the plaintiffs and the other leaseholders within Groups A, B,

and C.  Motion for Class Certification at 1.  The plaintiffs refer to this as the "Dear

Owner Letter."  *Id.*  The letter stated that a "lengthy audit process" had "established

that while we have not been deducting certain post-production costs, such as

gathering, compression and transportation from royalty payments, these costs are

properly allowable according to the terms of certain leases."  Plaintiffs' Appendix at

App 3.  It then informed the recipients of the letter that "[y]our lease is among those

that allow for such deductions."  *Id.*  Chesapeake advised the leaseholders that it

would begin subtracting those deductions beginning with the leaseholders' July 2011

royalty checks.  *Id.*

The plaintiffs allege that following this letter, the defendants breached their

leasehold agreements by deducting post-production costs from royalty payments in

violation of the provisions of the lease agreements stating that the defendants would

---

[*]    In their motion, the plaintiffs twice refer to a letter that was sent on
"August 1, 2001."  *See* Motion for Class Certification at 1.  However, since the letter
that they cite in their appendix is dated August 1, 2011, the court will assume that
"2001" was a typographical error.  *See* Plaintiffs' Appendix at App 3.

bear 100% of post-production costs.  Complaint ¶ 13.  In addition to seeking

recovery for themselves, the plaintiffs wish to certify a class to obtain relief on behalf

of Groups A, B, and C and any other similarly situated Chesapeake leaseholders who

signed leases with identical or substantially similar post-production cost provisions.

See *id.* ¶ 22.  Specifically, they seek to certify a class consisting of:

> All persons or entities entitled to payment of a lessor's or
> owner's royalty under oil and gas leases held by
> Chesapeake Exploration LLC or Chesapeake Operating,
> Inc., as lessees, ("Chesapeake") and Chesapeake's
> predecessors and successors, for lands or mineral estates
> located in Denton, Wise, Cooke, Erath, Hill, Hood, Dallas,
> Palo Pinto, Parker, Johnston [sic] and/or Tarrant counties,
> Texas, which have produced natural gas on or after July 1,
> 2011 (but prior to the date of a class notice in this action)
> (1) to whom Chesapeake sent the August 1, 2011 Dear
> Owner Letter from Chesapeake Vice-President, Land
> Administration, David T. Mobley regarding Adjustment in
> future royalty calculations, or a letter from Chesapeake
> containing the same material information, and (2) whose
> leases contain royalty payment clauses stating that royalties
> shall be calculated and paid free of post-production costs or
> expenses.

Excluded from the class are:  (1) the Mineral Management Service (Indian

tribes and the United States), and (2) defendants, their affiliates, predecessors,

employees, officers and directors.  Motion to Certify Class at 8.

### B.  Procedural Background

The plaintiffs filed their complaint against Chesapeake on September 14,

2012.  *See generally* Complaint.  After being served on October 4, 2012, *see* Summons

Returned as Executed (docket entries 7-8), the defendants filed their answer on

November 5, 2012. *See generally* Answer (docket entry 12). The parties were given

until March 31, 2013, to conduct discovery related to whether the case is certifiable

as a class action, and the plaintiffs were ordered to file a motion for class certification

by April 15, 2013. *See* Order of November 28, 2012 (docket entry 19). After two

extensions, *see* Orders of April 5 and May 30, 2013 (docket entries 28, 32), the

plaintiffs filed their motion for class certification on July 19, 2013. *See generally*

Motion to Certify Class. Chesapeake filed its response on August 12, 2013, *see*

Response and Objection to Motion for Class Certification ("Chesapeake Response")

(docket entry 38), and the plaintiffs filed a reply on August 27, 2013. *See* Reply in

Support of Motion for Class Certification ("Plaintiffs' Reply") (docket entry 43).

The matter is now ripe for decision.

## II. <u>ANALYSIS</u>

### A. <u>Rule 23 Class Certification Standard</u>

The plaintiffs seek to certify a class under Federal Rule of Civil Procedure

23(a)(1)-(4) and (b)(3). Motion for Class Certification at 7. Rule 23(a) requires the

party seeking certification to establish that:

> (1) the class is so numerous that joinder of all members is
> impracticable;
>
> (2) there are questions of law or fact common to the class;

> (3) the claims . . . of the representative parties are typical
> of the claims . . . of the class; and
>
> (4) the representative parties will fairly and adequately
> protect the interests of the class.

FED. R. CIV. P. 23(a)(1)-(4).  If an action satisfies the prerequisites of Rule 23(a), the

court then must determine whether "the questions of law or fact common to class

members predominate over any questions affecting only individual members, and that

a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy."  FED. R. CIV. P. 23(b)(3).

The Supreme Court has held that "[t]he class action is 'an exception to the

usual rule that litigation is conducted by and on behalf of the individual named

parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S.Ct. 2541, 2550

(2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  "In order to

justify a departure from that rule, 'a class representative must be part of the class and

possess the same interest and suffer the same injury as the class members.'"  *Id.*

(quoting *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977))

(internal quotation omitted).  Moreover, to satisfy the requirements of Rule 23, the

"party seeking class certification must affirmatively demonstrate his compliance with

the Rule -- that is, he must be prepared to prove that there are *in fact* sufficiently

numerous parties, common questions of law or fact, etc."  *Id.* at 2551 (emphasis in

original).

- 7 -

B.  The Plaintiffs' Rule 23 Motion for Class Certification

1.  *Rule 23(a) Prerequisites for Class Certification*

The court has "broad discretion" when deciding whether to certify a class.  See *Castano v. American Tobacco Company*, 84 F.3d 734, 740 (5th Cir. 1996).  That discretion, however, "must be exercised within the framework of [R]ule 23."  *Id.* Therefore, a class "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  See *General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982).

a.  Numerosity

Rule 23(a)(1) states that a class action is proper when "the class is so numerous that joinder of all members is impracticable."  FED. R. CIV. P. 23(a)(1). While the number of class members is relevant, numbers alone are not determinative of the outcome.  See *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981).  In addition to considering the number of potential class members, the court evaluates whether "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim" weigh in favor of certifying a class action.  *Id.*  For that reason, the number of class members that satisfy the numerosity prerequisite has varied in Fifth Circuit cases.  Compare *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 624 (5th Cir. 1999) (affirming certification of a class of 100 to 150 members), *cert. denied*, 528

U.S. 1159 (2000), and *Jones v. Diamond*, 519 F.2d 1090, 1100 n.18 (5th Cir. 1975) (finding that a class of 48 members satisfied numerosity), with *In re TWL Corporation*, 712 F.3d 886, 894-95 (5th Cir. 2013) (denying certification to a class of 130 members), *Leal v. Paramount Restaurants Group, Inc.*, No. 2:12-CV-0038-J, 2013 WL 1363616, at *2 (N.D. Tex. April 4, 2013) (Robinson, J.) (refusing to certify a potential class of at most 33 members), and *Simms v. Jones*, Nos. 3:11-CV-0248-M, 3:11-CV-0345-M, __ F.R.D. __, 2013 WL 3449538, at *9-10 (N.D. Tex. July 9, 2013) (Lynn, J.) (finding that numerosity was not satisfied by a class of up to 40 members).

The plaintiffs in this case propose certifying a class of approximately 43 members.  *See* Motion for Class Certification at 9.  They also assert that there could be other, as-yet unidentified, leaseholders who received the "Dear Owner Letter" and whose leases contain similar post-production provisions.  *See* Plaintiffs' Reply at 2. The court finds this assertion unconvincing, as it is unclear where the plaintiffs think these other leaseholders might be.  Through discovery, the plaintiffs asked Chesapeake to produce any leases that contained language similar to that in the plaintiffs' royalty clauses and that were held by leaseholders who had also received the "Dear Owner Letter."  *See* Appendix to Plaintiffs' Reply in Support of Motion for Class Certification at App 12 (docket entry 43-1).  In response to this request, Chesapeake produced 3,925 leases.  *Id.* at App 8.  After reviewing these leases, the

plaintiffs were only able to identify 70 leases, held by the 43 proposed class members, that contained similar post-production-cost clauses.  *See id.* at App 8.  If there are no more than these 70 relevant leases among the many leases produced by Chesapeake that meet the plaintiffs' search criteria, it is unclear whence the plaintiffs think more class members will appear.  The court's numerosity analysis will therefore focus on the 43 potential class members that the plaintiffs have found.  Under Fifth Circuit precedent, 43 class members is not determinative of the outcome of the numerosity prerequisite, so the court must turn to other factors to determine the impracticability of joinder.

The court concludes that the plaintiffs have not shown that their proposed class is so geographically dispersed and difficult to identify as to render joinder impracticable.  The plaintiffs define the class as those owning "leasehold royalty interests within Denton, Wise, Cooke, Erath, Hill, Hood, Dallas, Palo Pinto, Parker, Johnson and/or Tarrant Counties, Texas."  Complaint ¶ 1.  The court sees no reason why the 43 leaseholders owning land in these adjacent counties are so geographically dispersed as to negatively affect joinder.  Furthermore, the plaintiffs have already identified their 43 potential class members by determining which leaseholders received the "Dear Owner Letter" and possess leases with substantially similar post-production-cost provisions, and, as explained above, it does not appear possible for

them to find any more class members.  This factor, too, weighs against finding joinder impracticable.

Because of the relatively small size of the class, and the lack of either geographical dispersion of the proposed class members or difficultly in identifying class members, the court concludes that the plaintiffs have failed to demonstrate that their proposed class is so numerous as to render joinder impracticable.

b.  Commonality

Rule 23(a)(2) requires the plaintiffs to show that "there are questions of law or fact common to the class."  FED. R. CIV. P. 23(a)(2).  The Supreme Court has held that "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'"  *Wal-Mart*, 131 S.Ct. at 2551 (quoting *Falcon*, 457 U.S. at 148).  That means that the plaintiffs must show more than "merely that they have all suffered a violation of the same provision of law."  *Id.*  The Court elaborated with a quote from a recent journal article:

> "What matters to class certification . . . is not the raising of common 'questions' -- even in droves -- but, rather the capacity of a class-wide proceeding to generate *common answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."

*Id.* at 2551 (alteration in original) (emphasis added) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)).

Prior to the Supreme Court's decision in *Wal-Mart v. Dukes*, "[t]he test for commonality [was] not demanding." See *Mullen*, 186 F.3d at 625. However, the Fifth Circuit has since noted that *Wal-Mart* "heightened the standards for establishing commonality." See *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 839 (5th Cir. 2012). The commonality prerequisite now requires "more than the presentation of questions that are common to the class." *Id.* at 840. It is not sufficient merely to show that the resolution of one issue "'will affect all or a significant number of the putative class members.'" *Id.* (emphasis omitted) (quoting *Forbush v. J.C. Penney Company, Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993) (internal quotation marks omitted). Instead, under the post-*Wal-mart* test, "the claims of every class member must 'depend upon a common contention . . . of such a nature that it is capable of classwide resolution -- which means the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* (alteration in original) (quoting *Wal-mart*, 131 S.Ct. at 2551). Moreover, "the members of a proposed class do not establish that 'their claims can productively be litigated at once' . . . merely by alleging a violation of the same legal provision by the same defendant." *Id.* (quoting *Wal-mart*, 131 S.Ct. at 2551).

In this case, the representative plaintiffs are alleging that the defendants breached their contracts -- and the contracts of the putative class members -- by deducting post-production costs from royalty payments in violation of the royalty

clauses of those contracts.  Although this appears to present a common question -- did Chesapeake breach the royalty provisions of the plaintiffs' contracts by subtracting post-production costs? -- the real issue in determining commonality is whether proceeding as a class action will produce a "common answer" to the plaintiffs' question that helps "drive the resolution of the litigation."  See *Wal-Mart*, 131 S.Ct. at 2551.

To determine how to answer the plaintiffs' proposed common question, the court must look to Texas law.  The Texas Supreme Court has held that "in construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument."  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).  The Court further states that "courts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless."  *Id.* (emphasis in original).  Furthermore, "[n]o single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument."  *Id.*

The court concludes that there are significant differences between the leases of the proposed class members that make answering the question of whether Chesapeake violated the royalty provisions under Texas law a highly individualized inquiry.  While it may be true that the specific portions of the royalty provisions

- 13 -

highlighted by the plaintiffs are substantially the same, the court is required to view the contracts as a whole, and should not give a single provision "controlling effect." See *Coker*, 650 S.W.2d at 393.  Accordingly, the contracts in the plaintiffs' A, B, and C groups can be further broken down based on clauses that speak to elements such as "the point of sale" and "cost at the well" that differ, and in some instances are not included, in many of the contracts. *See* Chesapeake Response at 15-17.  Other leases contain clauses limiting the amount that Chesapeake pays to lessors for their share of gas to not "more than the price paid [Chesapeake] for [Chesapeake]'s share of gas." *Id.* at 15.  Furthermore, April Smith, an assistant controller in Chesapeake's accounting department, testified that Chesapeake does not subtract any post-production costs at all from royalties under some of the leases. *See* Chesapeake Appendix at App 11-13.

The plaintiffs insist that the differences between certain clauses in each lease's royalty provision are irrelevant, as their claims focus solely on the portions of the royalty provisions related to post-production costs. *See* Plaintiffs' Reply at 4-6. However, under the sort of "entire writing" review required by Texas law, determining whether Chesapeake violated the royalties provisions in each potential class member's contract requires an examination of the interplay between the post-production clause and the other portions of the royalties provisions in each individual contract.  For that reason, it is impossible to answer the plaintiffs' complaints with a "common

answer," as an individual determination is necessary for each plaintiff.  Therefore, the

court concludes that the Rule 23(a)(2) commonality prerequisite is not satisfied in

this case.

### c.  Typicality

Rule 23(a)(3) requires that "the claims . . . of the representative parties [be]

typical of the claims . . . of the class."  FED. R. CIV. P. 23(a)(3).  The test for

typicality involves a determination of "'whether the class representative's claims have

the same essential characteristics of those of the putative class.'"  *James v. City of

Dallas, Texas*, 254 F.3d 551, 571 (5th Cir. 2001) (quoting 5 JAMES W. MOORE ET AL.,

MOORE'S FEDERAL PRACTICE § 23.24 (3d ed. 2000), *cert. denied*, 534 U.S. 1113

(2002), *abrogation on other grounds by Wal-Mart*, 131 S.Ct. at 2551, *recognized by

Stukenberg*, 675 F.3d at 839-41.  Furthermore, "[t]ypicality focuses on the similarity

between the named plaintiffs' legal and remedial theories and the theories of those

whom they purport to represent."  *Lighthourn v. County of El Paso, Texas*, 118 F.3d

421, 426 (5th Cir. 1997), *cert. denied*, 522 U.S. 1052 (1998).  In practice, "[t]he

commonality and typicality requirements of Rule 23(a) tend to merge."  *Falcon*, 457

U.S. at 157 n.13.

In this case, typicality fails for the same reasons that commonality does.  While

the plaintiffs and the potential class members would all be alleging a violation of the

portions of the royalty provisions in their contracts dealing with post-production

costs, because of the differences between other clauses within those royalty

provisions, the plaintiffs' allegations would not be typical of those of many of the

proposed class members.  For example, the claims of the named plaintiffs would not

address the interaction of the post-production-cost clauses with the clauses in other

class members' royalty provisions dealing with valuation at the well or limiting

royalties to what Chesapeake receives for the gas.  *See* Chesapeake Appendix at App

45.  There are also provisions in the plaintiffs' leases that could cause their claims to

fail that do not exist in the leases of the other class members.  *Id.*  Therefore, the

court concludes that the plaintiffs' claims would not be typical of the claims of the

proposed class members.

### d.  Adequacy of Representation

Rule 23(a)(4) provides that the representative plaintiffs can only sue on behalf

of a class if they "will fairly and adequately protect the interests of the class."  FED. R.

CIV. P. 23(a)(4).  The Fifth Circuit has held that "Rule 23(a)'s adequacy requirement

encompasses class representatives, their counsel, and the relationship between the

two."  *Berger v. Compaq Computer Corporation*, 257 F.3d 475, 479 (5th Cir. 2001).

"'The adequate representation requirement overlaps with the typicality requirement

because in the absence of the typical claims, the class representative has no incentive

to pursue the claims of the other class members.'"  *Stirman v. Exxon Corporation*, 280

F.3d 554, 563 n.7 (5th Cir. 2002) (quoting *In re American Medical Systems, Inc.*, 75

F.3d 1069, 1083 (6th Cir. 1996)).  Because commonality, typicality, and adequacy

focus on "whether the named plaintiff's claim and the class claims are so interrelated

that the interests of the class members will be fairly and adequately protected in their

absence," commonality and typicality "tend to merge with the adequacy-of-

representation requirement, although the latter requirement also raises concerns

about the competency of class counsel and conflicts of interest." *Falcon*, 457 U.S. at

157 n.13.

The court concludes that the plaintiffs' counsel would be adequate.  They have

extensive experience in oil and gas lawsuits and have represented class actions before.

*See* Motion for Class Certification at 14-15.  However, due to the differences between

the plaintiffs' leases and those of the proposed class members, the plaintiffs are not

adequate class representatives.  They would have no incentive to pursue arguments

regarding the conflicting provisions in other class members' leases that do not exist in

their own leases.  See *Stirman*, 280 F.3d at 563 n.7 (finding that a plaintiff

attempting to certify a class of oil and gas leaseholders was likely not an adequate

representative because she "ha[d] no incentive to fully litigate those claims not

applicable to her").  Therefore, the court concludes that the plaintiffs have not shown

that they would adequately represent the interests of the proposed class members.

2. *Rule 23(b)(3) Requirements*

Rule 23(b)(3) states that a class action can be maintained if the prerequisites of Rule 23(a) have been met and the plaintiffs show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). "The predominance and superiority requirements are 'far more demanding' than is [R]ule 23(a)(2)'s commonality requirement." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997)).  To determine whether predominance exists, the court must "inquire how the case will be tried," which "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class." *Id.*  A superiority analysis, on the other hand, involves "assess[ing] the relative advantages of alternative procedures for handling the total controversy." FED. R. CIV. P. 23(b)(3) advisory committee's note to 1966 amendment.  "'[T]he superiority analysis is fact-specific and will vary depending on the circumstances of any given case.'" *In re TWL Corporation*, 712 F.3d at 896 (quoting *Robertson v. Monsanto Company*, 287 Fed. Appx. 354, 361 (5th Cir. 2008) (per curiam)).

The court concludes that predominance is lacking in this case for the same reasons that commonality and typicality are.  A trial on all of the proposed class members' claims would entail separates analyses of the different clauses in each individual royalty provision to determine whether Chesapeake had violated the post-production-cost clauses in each lease.  Therefore, the specific question on which the plaintiffs focus -- namely, whether Chesapeake breached the similar language in the proposed class members' royalty provisions related to post-production costs -- would not predominate over the more involved determinations of how those clauses relate to other portions of the royalty provisions in each individual class member's lease.

Superiority also does not exist in this case.  The plaintiffs argue that the size of their claims would make it difficult for them to bring their claims absent a class action, but they acknowledge that their claims would each be for several thousand dollars.  *See* Plaintiffs' Reply at 4.  This amount is not so small as to render a class action a superior method of adjudication, as the size of individual claims is generally only sufficient to persuade courts that class actions are superior when those individual claims are very small.  See, *e.g.*, *Phillips Petroleum Company v. Shutts*, 472 U.S. 797, 809 (1985) (observing that in a "lawsuit involv[ing] claims averaging about $100 per plaintiff . . . most of the plaintiffs would have no realistic day in court if a class action were not available"); *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 161 (1974) (finding that it was a "critical fact" in the Rule 23 determination that the plaintiff's individual

claim was only $70); *Carroll v. United Compucred Collections, Inc.*, 399 F.3d 620, 625-

26 (6th Cir. 2005) (holding that a class action was a superior method for litigating

the claims of 164 class members with claims of approximately $60 each); *Walton v.*

*Franklin Collection Agency, Inc.*, 190 F.R.D. 404, 412-13 (N.D. Miss. 2000) (finding

that the fact that "most class members hav[e] claims between fifty and two hundred

dollars . . . supports the conclusion that a class action is superior to other available

methods of adjudicating this controversy").  Due to the relatively small size of the

proposed class and the serious commonality problems within that class, the court

concludes that the plaintiffs' claims could be more easily resolved if the plaintiffs

bring them individually or if the plaintiffs with identical royalty provisions join

together their claims.  Therefore, neither prong of Rule 23(b)(3) is satisfied in this

case.

## C.  Notice Requirement

Chesapeake also argues that the plaintiffs cannot bring a class action regarding

these leases because the leases contain provisions that require leaseholders to give

Chesapeake 90 days' notice before filing a lawsuit.  *See* Chesapeake Response at 24-

25.  Because the court concludes that the plaintiffs cannot satisfy the Rule 23

requirements, it is unnecessary to address this argument.

III.   <u>CONCLUSION</u>

For the reasons stated above, the plaintiffs' motion to certify a class pursuant

to Rule 23(a)(1)-(4) and (b)(3) is **DENIED**.

**SO ORDERED**.

November 13, 2013.

_A. Joe Fish_

**A. JOE FISH**
**Senior United States District Judge**

- 21 -